# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 94-CA-00410-SCT

*BARBARA AN RUSHING*

*v.*

*CLOVIS EDWARD RUSHING*

**THIS OPINION IS NOT DESIGNATED FOR PUBLICATION AND MAY NOT BE CITED, PURSUANT TO M.R.A.P. 35-A**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/04/94 |
| TRIAL JUDGE: | HON. RAY HILLMAN MONTGOMERY |
| COURT FROM WHICH APPEALED: | MADISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | EARL L. DENHAM |
| ATTORNEY FOR APPELLEE: | PRO SE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | RENDERED IN PART; REVERSED AND REMANDED IN PART- 4/3/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE PRATHER, P.J., PITTMAN AND SMITH, JJ.**

**PITTMAN, JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

On March 20, 1993, Barbara Rushing (hereinafter "Barbara") filed her complaint for divorce on the grounds of adultery, habitual, cruel and inhuman treatment, or in the alternative irreconcilable differences. Clovis Rushing (hereinafter "Clovis") filed his answer to the complaint on April 21, 1993. The trial was held on February 1, 1994. The chancellor filed his opinion on March 15, 1994, in which he denied the relief requested stating that Barbara had not corroborated her claims with substantial evidence. A final order was entered by the chancellor on April 4, 1994. Aggrieved by the decision of the court below, Barbara appealed to this Court stating the following assignments of error:

> **I. THE LOWER COURT ERRED IN FAILING TO GRANT A DIVORCE TO BARBARA RUSHING ON THE GROUND OF HABITUAL, CRUEL, AND INHUMAN TREATMENT.**

**II. THE LOWER COURT ERRED IN FAILING TO AWARD THE RELIEF REQUESTED BY BARBARA RUSHING IN REFERENCE TO ALIMONY AND DISTRIBUTION OF THE MARITAL PROPERTY.**

**III. THE LOWER COURT ERRED IN FAILING TO AWARD THE RELIEF REQUESTED BY BARBARA RUSHING IN REFERENCE TO THE FOLLOWING: CUSTODY OF THE MINOR CHILD, CHILD SUPPORT, PAYMENT OF ALL MEDICAL DENTAL AND OCULIST BILLS OF THE MINOR CHILD, PROVISION FOR THE HIGHER EDUCATION OF THE MINOR CHILD, AND THE PURCHASE OF A $100,000 LIFE INSURANCE POLICY IN WHICH CLOVIS RUSHING LISTS THE MINOR CHILD AS THE SOLE BENEFICIARY.**

**IV. THE LOWER COURT ERRED IN FAILING TO AWARD ATTORNEY'S FEES TO BARBARA RUSHING.**

Clovis did not file a brief in this appeal. After reviewing the record, we find there was sufficient evidence on which the lower court could have granted a divorce and this Court, therefore, reverses the lower court's decision.

## STATEMENT OF THE FACTS

Barbara and Clovis were married in Moss Point, Mississippi, on June 1, 1968. The Rushings' two children, Todd and Rebecca, were ages twenty-three and twenty respectively at the time of trial.

Prior to their marriage Barbara completed two years of college in the field of elementary education and worked as a clerk at Sears. Clovis attended college at Delta State University on a football scholarship. After the couple married, Clovis returned to college where Todd was born in 1969. Clovis ultimately received a degree in physical education from Delta State University.

After Todd's birth, Barbara was primarily a mother, wife, and homemaker until her return to work when their youngest child, Rebecca, was two years old. Barbara also performed office work during the period of time in which Clovis operated an insurance business at home.

Barbara worked part-time at a bank and then went to work full-time for the American Heart Association. After Todd started school, Barbara decided to return to school to become a licensed practical nurse. Her earnings from the American Heart Association paid for day care for Rebecca, tuition and books for school, and supplemented the family's income. Barbara attended a one-year course and received her LPN degree in 1980. Despite the heavy demands on her time and energy, Barbara was Valedictorian of her class and received an award from the Baptist Hospital. Barbara worked very hard to achieve her education and care for her family while she continued working full-time. After graduation, Barbara worked at River Oaks as a licensed practical nurse.

Four years later Barbara returned to school to become a registered nurse because she wanted to improve her family's financial situation. Again, Barbara continued working while she attended school and took care of her family. Her earnings supplemented the family's income and paid school expenses. Barbara worked double shifts on weekends and also worked a second job at Doctor's Hospital in order to provide for her family. After her graduation as a registered nurse, Barbara earned

approximately $30,000 per year at River Oaks. Barbara worked hard as a registered nurse and continued to take weekend and other extra jobs to help make ends meet. When Barbara was diagnosed with diverticulitis, brought on by stress several months prior to the separation, and suffered severe pain, she continued working because she had to pay the bills.

After college, Clovis worked at Ingalls Shipyard in Pascagoula for a short time and then went to Miami. He returned to Jackson and began training bird dogs for Pete Friarson. Clovis trained dogs for approximately four years, then he quit and began selling insurance. The insurance venture did not work out, and Clovis returned to training dogs. Clovis worked sporadically over the years and was out of work for most of one year after an accident in which he injured his back. However, Clovis said that there is nothing physically wrong which would prevent him from working.

Clovis claims that he is unable to remain at home because of his job selling health and life insurance, so he stays in motels when he is on the road. Although Clovis claimed that he writes four to six policies per week, he could not remember the names of anyone who had purchased policies. He claimed that he receives commissions of 25 percent on health and 55 percent on life. Clovis plans to continue selling insurance. According to his financial declaration and testimony during the trial, Clovis claims income of $600 plus per month and expenses of $3,800 per month.

A few days prior to trial Clovis tried to purchase a new Toyota, but the loan was denied. Clovis identified his signature on a copy of the credit application for which he supplied the information. Clovis could not remember what amount the application indicated as his monthly income because he claimed he did not tell the truth when he applied for the loan. The application listed his gross income as $3,000 per month. Clovis testified that he planned to file bankruptcy in the near future, and he wanted to purchase a new car before he did so.

Clovis was frequently away from home for extended periods of time, leaving Barbara alone to raise their two small children. His work as a dog trainer's helper required Clovis to be out of town for three months during each summer and for frequent trips for field trials during the remainder of the year. As a result, he was gone most of the children's childhood.

In addition, Clovis frequently made other overnight trips, especially around holidays. Clovis was a member of two country clubs and often went on golf and hunting trips. He used credit cards to pay for his traveling and memberships at country clubs.

About four years before the separation, the Rushings' marital problems became more obvious. Barbara and Clovis argued because he was continually out until early morning hours or he did not come home at all. Clovis stayed out late at least one night every week. According to Clovis, he was either playing pool or visiting friends. As time went on and Barbara and the children would not see Clovis for days at a time, Barbara became very concerned and depressed.

Clovis forced Barbara to have sex each time he came home late at night, even though he knew that she had to get up at five in the morning to go to work. No matter how late he came in, he refused to allow Barbara to sleep. "[H]e would just do what he wanted to." The only time Barbara refused marital relations was when Clovis was drunk.

Throughout their marriage, Clovis handled the family's financial affairs. Because she trusted Clovis,

Barbara turned her paycheck over to him. Barbara and Clovis celebrated her degree as a registered nurse by purchasing a home for $40,000. The house was a two-story former summer home located at 414 Old Rice Road. Clovis told Barbara that the family needed money, so they borrowed against the house. Eventually, Barbara discovered that Clovis was gambling and was deeply in debt. As of December 31, 1993, the Rushings owed $48,000 on the mortgage. Clovis estimated the present value of the home at $82,000.

Barbara and Clovis had a joint checking account, which Clovis wanted to close, so Barbara agreed. In fact, Clovis stated that he closed the joint account to prevent seizure of the money for a $10,000 judgment against him. After the joint account was closed, Clovis did not deposit his paychecks into Barbara's checking account. Clovis gave Barbara some money and purchased certificates of deposit with the rest. Barbara never knew what Clovis did with the money he earned.

Barbara and Clovis were jointly given property, known as the Brookhaven property, by Clovis's father. Clovis sold lots from the Brookhaven property, but he never explained what he did with the money. According to Clovis, there are fourteen lots left in the Brookhaven property, valued between $1,000 to $1,200 per acre. The Rushings' assets include the house, 15.57 acres of land (the Brookhaven property), two boats, furniture, appliances, and two automobiles.

Barbara makes the monthly payments on the Honda Accord which she drives. The bank refused to finance the Dodge Dynasty for Clovis unless Barbara co-signed the loan. Clovis then wrecked the Dodge and received a check for $2,100 from the insurance company for repairs, but he never had the repair work done. Although he paid the mechanic $500, Clovis still owed $1,600 for the repairs on the Dodge. Clovis said that the car is still parked at the repair shop. Clovis claimed that he used the insurance money to pay monthly bills and back payments on his credit cards. Clovis plans to let the bank repossess the car, because he does not want it since it has not been repaired. He is completely unconcerned about the effect of a repossession on Barbara's credit.

Over a two-year period, Clovis forged checks for cash and to pay his personal bills through Barbara's personal checking account. He did not have signature power on Barbara's checking account. Clovis charged the materials for two decks which he built for friends and paid the bills with checks written on Barbara's bank account. Clovis was unable to confirm that he deposited money into Barbara's account, even though he claimed to have documentation. "I got a lot of them [deposit slips]. Wherever they are."

Barbara was unsuccessful in her attempts to stop Clovis from using her bank account by forging her name. She repeatedly asked Clovis to stop writing checks on her account. Each time Clovis agreed, but then he continued to write checks and then hid the bank statements and credit card bills so Barbara would not find out. Ultimately, he wrote checks which totaled $8,117, but he never explained where her money went. Clovis continued to write checks on Barbara's checking account for several months after her account was closed. He claimed that he did not know the account was closed until the checks bounced. Clovis admitted that he forged Barbara's name on checks.

Over the years, Barbara saw Clovis gamble on ball games, bookies, and at the casino. He lost a great deal of money because of his gambling, and he even used the children's savings accounts to pay his bookie. Barbara became aware of the severity of his gambling problem when bookies repeatedly called while Clovis was hospitalized.

In addition to stealing money from his wife and converting the children's savings to his use, Clovis also cashed the children's pay checks and kept the money. On another occasion, Rebecca's clothing was destroyed in a fire, and Barbara filed a claim for her on the homeowner's insurance. Clovis cashed the insurance check for $1,513.89 and kept the money even though he knew the money was specifically for his daughter to replace her clothing. Clovis did not give his daughter "one dime" and informed the court that Rebecca was not entitled to receive the money. Clovis claimed that he paid two house payments with the money from his daughter's insurance check. Clovis owes back taxes for 1990. Barbara's taxes are always deducted from her paycheck, but Clovis does not pay taxes until the end of the year.

Clovis had a history of violent episodes. In 1974, he had an altercation with a police officer in Ridgeland, and in 1989 he had an altercation with a black man in Jackson. At a class reunion he got into a shoving match because someone accidentally bumped into him. Clovis was sued because of a violent episode in which he became angry at a salesman and a judgment for $1,000 in actual damages and $10,000 in punitive damages was entered against him, but he never told Barbara about the $10,000 judgment. Clovis agreed that violence played a part in the award of punitive damages. Clovis sold their son's car and took the money to pay the lawyer who represented him in the lawsuit. Clovis admitted that he closed their joint checking account to keep his money from being seized as a result of the judgment.

Sue Sheppard, Barbara's sister, stated that she and her sister have always been close, and that Barbara talked to her frequently about the marriage and problems at home. Sue visited with her sister regularly. Barbara became distant, withdrawn, sad, lonely, and depressed during the four to five years prior to the separation. After the separation, Barbara became more like her old self again. Clovis told Sue that he knew he was in hot water with Barbara because of the gambling. Sue has known Clovis since high school, and he is a person that resorts to fists, brute force, or physical power to overcome obstacles. Sue saw hand prints on Barbara's arms and other evidence of physical abuse. She also saw bruises on Barbara right immediately the separation. There were several incidents where Sue saw Clovis shouting and cursing at Barbara. One in particular occurred on the afternoon of Todd's graduation. The "least little thing could set" Clovis off and he would lose his temper. Sue said that Barbara was always a very meek and mild individual.

A few months prior to the separation in March, Barbara began experiencing severe medical problems and was diagnosed with diverticulitis which was brought on by extreme stress. Though the situation between Barbara and Clovis was very stressful so that she was very ill, she never missed a day of work.

When Barbara thought Clovis had lost his job, she tried to be understanding and help him. Then she found telephone records listing several calls to a Marie Glass in Philadelphia, Mississippi. Barbara talked to Marie Glass and then confronted Clovis. Clovis told Barbara that he had hidden the telephone records. Barbara accused Clovis of adultery, and he admitted that he had sex with Glass over a period of months. After she discovered that Clovis was cheating on her, Barbara no longer wanted to help him or to remain in the marriage. Barbara and Clovis separated in March of 1993.

After the separation, Barbara discovered that Clovis had been having an affair with a second woman, Jean Lee. Although Clovis admitted that he saw Jean Lee in October, he denied that he was living

with her or having an affair.

Barbara, Clovis, and the children lived in the marital homestead until the couple separated. Barbara and Rebecca moved to an apartment in Mobile, Alabama. Barbara works at a local hospital in Mobile, but she makes less money than she did in Mississippi. Clovis did not provide financial support for the children or Barbara after the separation. At the time of trial, Barbara earned approximately $2,000 per month. Although Barbara has medical insurance, she could not afford insurance for Todd, who is a student, and Rebecca, who is still a minor.

Rebecca is attending Faulkner College at a cost of $1,500 per quarter. At the time of the trial, Rebecca was in her second quarter pursing a degree in paralegal studies. Rebecca does not have transportation to travel the twenty miles from Barbara's apartment to college each day, so she lives in the dormitory on campus. Barbara drives to and from Faulkner to bring Rebecca home for weekends and breaks. Clovis informed the court that he was willing to pay child support for Rebecca.

Clovis claimed that he and Barbara slept together several times after the separation; Barbara stated that the only occasion that they had sex was the night Clovis came to her apartment and raped her. The rape occurred when Clovis showed up late one night at Barbara's apartment in Mobile. They argued and Clovis picked her up and carried her down the hall to the bedroom. Even though Barbara resisted, Clovis "did what he wanted to" and forced her to have sex with him.

Clovis's mistreatment of Barbara included screaming threats, yelling in her face, pushing and grabbing, and even stepping on her. Clovis admitted that he grabbed Barbara, but he claimed that he did not mean to hurt her. Barbara was afraid of Clovis. She made no attempts to reconcile with Clovis after the rape because she strongly felt that their problems could not be resolved. According to Barbara, the marriage is hopeless.

Barbara rarely used credit cards, but Clovis regularly used credit cards to support his gambling and frequent travel. After their separation, Clovis found credit cards issued to Barbara while digging through a cabinet one day and charged $569.25 in Gulfport on one of the credit cards. He charged $300 on a second card issued to Barbara. Since Barbara did not request cards for Clovis when she applied for the two credit cards, she did not know that Clovis could also charge on the accounts. When he tried to use Barbara's credit card a second time, the card was taken from him. Clovis did not repay Barbara for the charges. Barbara never used either one of the credit cards.

Clovis's inability or refusal to tell the truth was glaringly apparent throughout his testimony, but is most obvious when he repeatedly stated that he could not remember where he spent Monday night before the trial started on Tuesday morning. At first, Clovis claimed that he attended an insurance school, but he could not remember the names of the instructors, the address, or how he arrived at the school. Clovis then claimed that he spent the night before the trial in his car, but he could not remember where he parked. Clovis stated that he did not know where he spent Friday, Saturday, Sunday or Monday night prior to the trial, or even where he had been for the past two weeks, but he knew he was not at a casino. He attempted to act confused as to what day it was and asked the court if it was Tuesday. However, Clovis was able to "remember" alleged financial details regarding his income, even though he could not recall where he spent the night before trial.

## DISCUSSION OF LAW

First, we note again that Clovis did not file an appellee's brief in this matter. Rule 31(d) of our Mississippi Rules of Appellate Procedure provides in part:

> If an appellee fails to file the appellee's brief as required, such brief if later filed may be stricken from the record on motion of appellant or on the Court's own motion. An appellee who fails to file a brief will not be heard at oral argument except by permission of the Court.

In *Snow Lake Shores Property Owners v. Smith*, 601 So. 2d 357 (Miss. 1992), this Court stated the following regarding Rule 31(d) and the appellee's failure to file a brief.

> Although unsaid in 31(d), "[t]he rule has been stated in numerous cases that the **failure of the appellee to file a brief is tantamount to a confession of error** and will be accepted as such unless we can with confidence say, after considering the record and brief of appellant, that there was no error." This rule is affirmed in today's decision.

*Id.* at 361 (citations omitted; emphasis added). This rule is based upon the sound policy that this Court should not act as an advocate for one party or the other. If an appellee fails to file a brief, then this Court may, on its own initiative, create the opposing arguments. Thus, this case may be reversed and a decision rendered here. This we cannot say because it appears that the trial court erred in not granting a divorce to the Appellant. However, we do consider the merits of the matters before this Court.

### Standard of Review

The standard of review in domestic matters is limited by this Court's substantial evidence/manifest error rule. Manifest, as defined in this context, is "'unmistakable, clear, plain, or indisputable.'" *Brennan v. Brennan*, 638 So. 2d 1320, 1323 (Miss. 1994) (quoting *Black's Law Dictionary*). "This Court will not disturb the findings of a chancellor unless the chancellor was manifestly wrong, clearly erroneous or an erroneous legal standard was applied." *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990).

### I. THE LOWER COURT ERRED IN FAILING TO GRANT A DIVORCE TO BARBARA RUSHING ON THE GROUND OF HABITUAL, CRUEL, AND INHUMAN TREATMENT.

Barbara contends that the chancellor was manifestly erroneous in denying her a divorce on the grounds of habitual cruel and inhuman treatment. In his opinion, the chancellor found that Barbara had "failed to substantially corroborate her testimony in that [Clovis] denied all acts complained of in her Complaint." The testimony of Sue Sheppard, the sister of Barbara, is sufficient to corroborate the testimony of Barbara. There was substantial evidence to support Barbara's claims. This Court has stated that a charge of habitual cruel and inhuman treatment may be sustained by a preponderance of the evidence. The evidence here showed many years of cruel treatment that caused the Appellant financial problems and family problems that led to her depression and endangered her health.

This Court has stated that "[c]ruel and inhuman treatment such as to warrant the grant of a divorce is conduct endangering life, limb, or health, or creating reasonable apprehension of danger, or unnatural and infamous conduct making the marital relation revolting." *Bland v. Bland*, 620 So. 2d 543, 545

(Miss. 1993). Barbara did provide the Court with sufficient evidence to find cruel and inhuman treatment. Barbara did testify to the fact that she suffers from diverticulitis which is caused by extreme stress. Her sister testifed to her health decline. While the proof is not as explicit as we might desire, it is overwhelming in its devasting effect on the Appellant over many years.

This Court has said that acts which occur after the parties separate may be considered in a charge of habitual cruel and inhuman treatment. *McKee v. Flynt*, 630 So. 2d 44, 48 (Miss. 1993). When you look to the acts which occurred throughout the marriage and after the separation, Barbara has presented a case of habitual cruel and inhuman treatment. Without hesitation, this Court can find that the chancellor was manifestly wrong and erred in not granting a divorce on cruel and inhuman treatment grounds.

Since this Court finds that a divorce should have been granted upon the grounds of habitual cruel and inhuman treatment, the case is rendered on the divorce issue and remanded for the chancellor to determine any further relief if any. It should be the chancellor to determine whether there should be alimony, if so how much, whether the property should be distributed and how, and the matter of child custody and support, and finally, attorney fees. This Court cannot determine whether the chancellor abused his discretion in deciding these issues when he never reached them.

**RENDERED IN PART; REVERSED AND REMANDED IN PART FOR PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**LEE, P.J., PRATHER AND SULLIVAN, P.JJ., BANKS, McRAE, ROBERTS, SMITH AND MILLS, JJ., CONCUR.**